# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | **CRIM. NO.: 10-cr-0037** |
| v. ) | |
| ) | |
| JAMASON CHARLES, ) | |
| ) | |
| Defendant. ) | |

## Memorandum Opinion

Finch, Senior Judge

THIS MATTER came before the Court on the motion of defendant Jamason Charles ("Charles") to exclude the eyewitness identification of Steven Hendrickson. Charles alleged that the eyewitness identification conducted by Virgin Islands Police Department ("VIPD") Sergeant Dino Herbert was impermissibly suggestive and the identification unreliable. The government opposed the motion. A hearing was held on the matter on April 7, 2011. At the hearing, the government offered the testimony of VIPD officers Dino Herbert, Cureene Smith and David Stevens. The defendant presented the testimony of Steven Hendrickson. Based on the testimony of the parties and the documentary evidence presented, the Court determined that the identification was admissible and entered an order denying Charles' motion on April 8, 2011. The Court now sets forth the facts and legal analysis supporting its decision.

I.      Facts

Dupert "Apache" Knowles was killed on March 16, 2010 near the Marley housing project in Frederiksted.  On May 8, 2010, defendant Charles was arrested for his murder and related firearms charges. The arrest warrant was supported in part by the statements of an unidentified witness who told police that he saw Charles commit the murder.  The witness also identified Charles in a photo array.  The witness later testified before the grand jury providing much of the same information he provided to police.  The identity of the witness during this time had not been disclosed to Charles for security reasons.  However, shortly before trial was to begin, the witness contacted counsel for Charles and Charles learned that the witness was Steven Hendrickson ("Hendrickson").  Hendrickson informed Charles' counsel, Attorney Kye Walker, that he had been coerced by police into identifying Charles as the killer of Knowles.  The coercion allegedly included pressuring Hendrickson to point out Charles as the murderer in the photo array.  Following Hendrickson's conversation with Attorney Walker, Charles filed the instant motion to exclude the photo identification made by Hendrickson.

Hendrickson's involvement in the investigation of Knowles' murder began on May 1, 2010.  Hendrickson had been arrested for a domestic violence incident and was being held at the Francis Command police station in Frederiksted.  The arresting officer was David Stevens of the Virgin Islands Police Department.  According to Stevens, Hendrickson asked him questions about the program "Crimestoppers" and told him that he wanted to talk about the murder of Knowles.  He stated that he had witnessed his friend, "Apache," (an alias of Knowles'), being murdered by the Lime Bar.  Hendrickson told Stevens that he saw Charles (whom he called "Jama") and Apache talking and then Jama began shooting Apache, continuing to pull the trigger even after all the bullets had been discharged.  Officer Stevens said that Hendrickson

demonstrated the way Jama shot Apache, pulling the imagined trigger and saying "click, click, click." Jama told Hendrickson he would kill him whether he told police what he had seen or not. In response to Hendrickson's statements, Stevens called 911 and asked to have someone in the Investigation Bureau informed that an individual in custody had information about a murder. As a result of Stevens' call, Sergeant Dino Herbert and Officer Cureene Smith, who were in the vicinity of Christiansted conducting an investigation in another matter, were told that an individual located at the Francis Command Police Station had information about a homicide. Neither Sergeant Herbert nor Officer Smith knew which homicide was involved. Once the officers arrived at Francis station, Herbert and Stevens escorted Hendrickson to an office upstairs to conduct an interview. When the interview began, Herbert, Stevens and Smith were all present in the room with Hendrickson but Stevens left after a few minutes and did not participate in the questioning or see the photo array identification.

      Herbert testified that he began the interview by asking Hendrickson to tell his story. According to Herbert, Hendrickson said that shortly before the murder took place, he was by Marley (the project), when he crossed the street to where Jama and Knowles were standing outside a club. Hendrickson was rolling a joint when the police came to shut down the club and he stopped. Sometime after the police left, Hendrickson heard shots and turned around to see Jama standing over Knowles firing a chrome-colored gun. He indicated that he had heard 4 or 5 shots. Jama was pulling the trigger and Hendrickson heard the clicking sound of the trigger being pulled. Then Jama ran past him towards the Marley Project. Hendrickson also stated that he had lent a cell phone to Knowles and that he turned over the body to retrieve it after Knowles had been shot. Hendrickson was scared by the shooting he had witnessed and went home after he retrieved the phone. Hendrickson said that since the incident he had avoided Jama because he

had heard he was threatening witnesses. In fact, when Hendrickson did encounter Jama, Jama told him that he would kill him, whether he went to the police or not. Hendrickson told Herbert that he knew Jama from the streets and knew that he lived by the bakery in Frederiksted. He also provided a physical description of him, stating that he was short, slim and often wore a hat. Hendrickson's statements were subsequently documented by Herbert. Hendrickson then reviewed his written statement and signed each page.

At some point during the interview, Sgt. Herbert requested that forensics produce a photo array that included Jamason Charles. The photo array contained six black and white photos of African American males who appear to be between the ages of 25-30. All of the individuals are dressed in dark colored clothing, except for the individual in photo #4 who is wearing a white T-shirt. In photo #3 Charles is wearing what appears to be a collarless shirt with stitching. Herbert testified that he was able to tell from looking at the photo that Charles was wearing a correctional uniform because of his familiarity with the uniform. Hendrickson selected photograph #3 and wrote his initials "S.E.H" below it along with the date: 5/1/10.

At some point during the interview with Hendrickson, Hendrickson expressed concern about the status of his domestic violence charge and asked whether he would be able to go home. Herbert told him that he would be booked for the crime but would tell the police that Hendrickson was cooperating in the Knowles homicide investigation.[1]

On August 17, 2010, Hendrickson testified before the grand jury and provided testimony concerning the murder of Knowles. He stated that he saw "Jama" kill Knowles and that afterward Jama threatened to kill him, whether he went to the police or not. (Hearing Tr. at 2-

---

[1] The domestic violence case against Hendrickson was subsequently dismissed.

3.)  Hendrickson stated that Jama lived in Frederiksted across from the bakery and described Jama as short with no hair and light brown skin. (*Id*. at 3.)  He stated that on the night of March 16, 2010, he was on Marley Corner in Frederiksted when the police came to close down a club located on King Street. (*Id.* at 4-5.)  Jama and Apache were there talking.  After the police drove off, Jama, standing behind Apache, shot him four to five times in the back of the head and then ran off.  (*Id*. at 5.)  Hendrickson was able to see what occurred because he was only about four steps away from where the shooting occurred. (*Id*. at 7.)  The gun used in the shooting was all chrome with a black handle. (*Id*. at 6.)   After the shooting, Hendrickson retrieved the cell phone he had lent Apache and went home. (*Id*.)

At the evidentiary hearing on April 7th, Hendrickson contradicted much of what he had previously stated to the police and the grand jury.  Slouched in the witness stand, answering questions with a nod or grunt, despite numerous requests to answer yes or no, and at times asking his interlocutor questions rather than responding to them, Hendrickson showed his disdain for the Court proceedings and an obvious desire to remove himself from any further proceedings in this case.

Hendrickson confirmed that he was questioned by Herbert and that two other officers were present during the interview.  However, in Hendrickson's version of events, the police initiated contact and unprompted, began to question him about Jama and the murder of Knowles. Hendrickson claims that Herbert showed him a photo array with six people and pointed at Jama and asked if he knew Jama.  At the hearing, Hendrickson confirmed that Jama was at the club that night, but stated that he, Hendrickson, was probably high and drunk, and did not notice what Jama was doing. He also stated that although he had heard gun shots that night, he did not know where they came from. He said he told the lie that Jama shot Apache just to get out of Herbert's

office.[2] In essence, Hendrickson concedes that the police accurately recorded the statements he made on May 1, 2011, but he denies that the statements were true. He told the police that he saw Jama shoot Apache, but it was a lie; he stated that he had seen a gun, but he had not; he stated that the gun was chrome, but it was not; he stated that Jama had kept pulling the trigger, but it wasn't true; he stated that he had retrieved the cell phone from Apache, but he had not; he told police he was scared, but he was not. As a result of all these "lies" and his statement to the police that he feared for his life, the government subsequently provided him with the means to leave St. Croix. Hendrickson denied that he left out of fear for his life—he told the Court that he was just bored. Hendrickson eventually came back to St. Croix of his own accord without government assistance.

Approximately two weeks before the hearing, Hendrickson contacted Charles' attorney Kye Walker. When asked how he got into contact with Charles' attorney, he first indicated that he talked to a cousin because he wanted to stop being bothered about the case. However, Hendrickson refused to identify his cousin. When pressed, he said he didn't want to get his cousin involved, and then started talking about how he did not want to be involved in the case and how he did not know anything. Later, he stated that he found Attorney Walker's name in a phonebook when looking for a lawyer to advise him on how to withdraw from the case. He denied knowing that Walker was Charles' attorney.[3]

## II. Discussion

---

[2] Hendrickson stated that he asked to go to the hospital more than once during the interview because he was bleeding from the injuries incurred during the domestic violence incident, and in fact he was taken there later that night. However, photos taken of Hendrickson, with views of his front, side and head, when he was booked on May 1, 2011 do not show any serious injuries. (Gov't. Ex. Group 1.)

[3] It was also disclosed at the hearing that sometime after Hendrickson gave his statement to the police, he went to the bakery where Charles' mother works and told her that Jama did not commit the murder. Hendrickson was unable to explain how he knew that to be a fact. When questioned, he simply responded that he did not know anything.

### A. Standard of Review for a Pretrial Identification

The Supreme Court has acknowledged the danger that the "employment of photographs by police may sometimes cause witnesses to err in identifying criminals." *United States v. Stevens*, 935 F.2d 1380, 1389 (3d Cir. 1991) (citing *Simmons v. United States*, 390 U.S. 377, 383 (1968)). That danger may be exacerbated when the "the photograph of a single such individual . . . is in some way emphasized." *Id*. (citations omitted). Accordingly, "showing a witness a photographic array can constitute a denial of due process when police attempt to emphasize the photograph of a given suspect, or when the circumstances surrounding the array unduly suggest who an identifying witness should select." *United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003) (citations omitted).

Notwithstanding this concern for tainted identification procedures, an identification is not automatically excluded because a degree of suggestiveness is present. *United States v. Dowling*, 855 F.2d 114, 117 (3d Cir. 1988), *aff'd*, 493 U.S. 342 (1990). Instead, "evidence of a pretrial photographic identification is inadmissible 'only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Stevens*, 935 F.2d at 1389 (quoting *Simmons*, 390 U.S. at 971).[4] The Court applies a two-pronged test to determine whether to exclude the pretrial identification. First the Court asks whether the identification procedure was unnecessarily or impermissibly suggestive.

---

[4] As the Third Circuit recognized, this is the standard employed for the admission of an in-court identification following a suggestive pretrial identification. *Id*. at n.9 (citing *Neil v. Biggers*, 409 U.S. 188 (1972)). However, the Supreme Court concluded that the standard served equally well for determining the admissibility of a pretrial identification. *Biggers*, 409 U.S. at 198 ("While [this] phrase was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of 'irreparable' it serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself.").

*Id*.[5] Second, even if the procedure was unnecessarily suggestive, the Court must determine whether the pretrial identification was nonetheless reliable. *Id*.

### 1. Whether the photo array was impermissibly suggestive

The Court examines the totality of the circumstances to determine if a photo array presentation was impermissibly suggestive. *Lawrence*, 349 F.3d at 115 (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)). The Court looks at factors such as "the size of the array, the manner of presentation by the officers, and the array's contents." *United States v. Rosa*, 11 F.3d 315, 330 (2d Cir. 1993).

Charles contends that the photograph array was inherently suggestive because he was the only individual wearing a prison uniform. The Court recognizes that a "mug shot" of an individual in a photo array could be deemed suggestive inasmuch as it suggests a prior police record. *Lawrence*, 349 F.3d at 116. However, in this case, the black and white photos used in the array do not reveal the distinctive bright colors used in the Bureau of Corrections' prison uniforms. Moreover, only a small portion of the uniform was visible such that it would be difficult to conclude that Charles was wearing a uniform. The fact that Sgt. Herbert recognized the stitching as indicative of the Bureau of Corrections uniform is not dispositive. As a police officer, he has great familiarity with the corrections uniforms. There is little basis for an ordinary observer to conclude that Charles was wearing prison garb. Thus, the Court concludes that the photo array was not suggestive because of the clothing Charles wore.

---

[5] The first prong actually contains two component parts: "that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures." *Id*. In other words, the Court must determine both whether there was impermissible suggestiveness and whether the suggestiveness was unnecessary.

Charles also contends that the identification was suggestive because when Herbert showed the photo array to Hendrickson, he pointed at Jama's photo several times and asked Hendrickson if he recognized him. The Court has no trouble concluding that any attempt by the police to single out the photograph of Charles when conducting the identification procedure with Hendrickson would render the process unduly suggestive. *See, e.g., Cossel v. Miller*, 229 F.3d 649, 651, 655 (7th Cir. 2000) (identification impermissibly suggestive where officer singled out defendant's photo after victim unable to identify her attacker in the photos presented). However, the Court is not inclined to accept Hendrickson's version of the proceedings. What is more, the Court finds, as discussed below, that Hendrickson's identification of Charles was made independently of the photo array. Hendrickson stated that he knew an individual named Jama and that he lived in Frederiksted across from the bakery. Herbert testified that from these and other details provided by Hendrickson, he was able to confirm that the individual "Jama" was in fact the defendant, Jamason Charles, an individual whose appearance and residence Herbert was familiar with.

### 2. Whether the identification was otherwise reliable

"[R]eliability is the linchpin in determining the admissibility of identification testimony," *Stevens*, 935 F.2d at 1391 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114, (1977)). Thus, suggestiveness, even where present, will not necessarily render an identification inadmissible. Instead the Court must determine whether "under the totality of the circumstances, the suggestiveness created "a very substantial likelihood of ... misidentification."" *Id*. (quoting *Simmons*, 390 U.S. at 384). The Supreme Court in *Neil v. Biggers*, 409 U.S. 188 (1972), identified the factors to be considered in evaluating the likelihood of misidentification:

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id*. at 199

In this case, the Court has already opined that the photo array was not suggestive. However, giving Charles the benefit of the doubt, the Court proceeds to consider whether there are other indicia of reliability that would mitigate any potential taint from the photo array. Before undertaking such an analysis, the Court must first establish what Hendrickson saw on the night of Knowles' murder. To do so, the Court must choose between the competing narratives of what Hendrickson told the police and the grand jury and what Hendrickson stated in the evidentiary hearing on April 7th. As indicated earlier, the Court cannot give much credence to Hendrickson's testimony at this hearing. The narrative that Hendrickson recounted to the police on May 1, 2010 (recalling that he did not deny what he said to Herbert, only the truthfulness of his statements) and to the grand jury has a great deal more plausibility than the story he told in Court at the evidentiary hearing. In his earlier accounts, on the night of the murder, he approached an area outside a bar in Frederiksted where he saw his friend Apache talking to Jama. The police came to shut down the bar and then left. A few minutes after the police left, he heard 4-5 guns shots and saw Jama shooting at Knowles from behind. After the attacker ran away, Hendrickson turned the body over to get his cell phone. He was scared and went home. That is a plausible account of events, one that presents no logical inconsistency. Moreover, Hendrickson provided details that corroborated what the police found at the murder scene: the pattern of blood found on the ground indicated that Knowles' body had been moved, consistent with Hendrickson's search for the cell phone, and 5 projectiles had been recovered from the victim's body, consistent with the number of shots he heard that night. Hendrickson also

provided a detail that was unlikely to be concocted: he stated more than once that he heard the "click, click, click" sound of the trigger being pulled even after the gun used to kill Knowles had been discharged. If Hendrickson had merely wanted to make a statement to end Herbert's questioning, it is difficult to understand why he would "embellish" his story with unnecessary details such as this.  It is also plausible that Hendrickson originally kept quiet about what he had seen but then later decided to speak to the police while in custody.   As Hendrickson indicated, when he saw Jama in the street, he was told that he would be killed whether or not he went to the police, leaving him with less incentive to keep what he saw to himself.   Based on his reasonable fear that he would be killed because he had witnessed the murder, a fear he communicated to the police, the government provided him the financial means to leave the island.

On the other hand, his denials in court at the evidentiary hearing do not have the ring of truth; instead they appear to be a flagrant attempt to avoid further involvement in this case.  It is not plausible that Hendrickson provided corroborating details to the murder by chance.  There was no reason for him to mention that he "flipped" the body to get the cell phone when giving the story he allegedly thought the police wanted to hear.  It is also not plausible that he told the police that he was scared because he was bored and wanted to leave the island.  Finally, the least plausible fact of all the improbable statements made is that he chanced upon Charles's attorney by flipping through the pages of the phone book.  Having decided that the accurate account of what Hendrickson saw that night consists of the facts he related to the police and the grand jury, the Court will analyze the reliability of his identification pursuant to those facts.

Hendrickson, in his own words, was about "four to six steps" away from where Knowles was shot, and he indicated that the area was well-lit. (Gov't Ex. Group 4, Grand Jury Tr. at 6-7.) Being in close proximity to the murder and in a well-lit area gave him an adequate opportunity to

view the shooter, a factor weighing in favor of reliability. Hendrickson indicated that he had been drinking and smoking marijuana that night, calling into question the degree of his attention. On the other hand, Hendrickson gave a description of Charles that corresponded to his appearance, there was no testimony that he had trouble identifying Charles in the array, and he made the identification less than two months after the shooting. In any case, there is no dispute that Hendrickson knew Charles from seeing him at Charles' mother's bakery in Frederiksted, another factor bolstering reliability. *See, e.g., United States v. Harris*, Crim. No. 05-598, 2006 WL 2077017, at *2 (E.D. Pa. July 21, 2006) ("witnesses' identifications demonstrate sufficient indicia of reliability because the witnesses were very familiar with the people whom they identified"); *United States v. Hefferon*, 314 F.3d 211, 219 (5th Cir. 2002) (victim's knowledge that assailant was her upstairs neighbor bolstered the reliability of identification procedure). Based on all of these considerations, the Court concludes that any potential suggestiveness created by the stitching in the clothing Charles wore in the photo array did not create a "very substantial likelihood of . . . misidentification." Accordingly, the Court has denied Charles' motion to exclude evidence of Hendrickson's photo array identification.

                           ENTER:

    April 19, 2011

                                   _____/s/_____
                                   RAYMOND L. FINCH
                                   SENIOR U.S. DISTRICT JUDGE